

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:DEL/JKW/JBD
F.#2020R00851

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 5, 2025

By ECF

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Martial C. Amilcar
               Criminal Docket No. 23-18 (S-1) (AMD)

Dear Judge Donnelly:

      The government respectfully submits this letter in anticipation of sentencing of Martial C. Amilcar, which is scheduled for November 12, 2025, at 10:30 a.m. and in response to the defendant's sentencing submission. ECF Dkt, No. 217 ("Def. Mot."). On May 8, 2025, the defendant pled guilty to Count One of the Superseding Indictment charging him with racketeering, in violation of Title 18, United States Code, Section 1962(c), in connection with multiple crimes he committed as a member of the Hyena Crips. As part of his plea agreement with the government, the defendant admitted to conspiring to commit fraud using means of identification to defraud the Small Business Administration ("SBA") (Racketeering Act Six) and conspiring to murder rival gang members (Racketeering Act 10).

      The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 97 to 121 months' imprisonment. For the reasons set forth below, including the seriousness of the defendant's conduct; his flagrant disregard for the law and potential danger to the community; and the need for deterrence, the government respectfully requests that the Court impose a term of 121 months' imprisonment, the high end of the defendant's advisory Sentencing Guidelines range.

I.      Background

    A.      The Hyena Crips Enterprise

The Hyena Crips is a violent street gang that mainly operates out of Brooklyn, with ties to Haiti. See Presentence Investigation Report ("PSR") ¶ 4.[1] Hyena Crips members gain status by "putting in work," which means by committing crimes including fraud, robberies and acts of violence, including murders. Id. Members of the gang also engaged in drug trafficking, bank fraud and access device fraud to earn money to be shared among members of the gang. Id. To promote and enhance the prestige, reputation and position of the gang with respect to rival organizations, members of the Hyena Crips used intimidation, threats of violence, and acts of violence to keep victims and rivals in fear. Id. ¶ 7. Between approximately 2011 and 2020, there were numerous stabbings, assaults and murders committed by members of the Hyena Crips against individuals they believed to be rival gang members, in particular, members of the Haitian Loc ("HL").

    B.      The Defendant's Membership in the Enterprise

The defendant has been a member of the Hyena Crips since at least 2015 when his membership in the "Hy3na Lif3 Styl3" was announced on social media.[2] The defendant himself advertised his own affiliation with the Hyena Crips in January 2018 by posting "IM HYENA." A photograph of the post is below.



On May 27, 2021, while he was on home detention with GPS monitoring, he boasted that once his GPS monitoring ("his bracelet") was removed, he would properly represent the Crips: "n**** don't be enforcing . . . when I get off my bracelet imma show n**** enforcement nd

---

[1] On October 20, 2025, the defendant submitted seven objections to the PSR concerning his education, employment and medical history. The government has reviewed these objections and has no information concerning these objections. The Court need not resolve disputes if "the matter will not affect sentencing." See Fed. R. Crim. P. 32(i)(3)(B) (courts must resolve PSR disputes unless "a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing").

[2] In 2015, the defendant also was arrested (and later convicted) following an incident in which he and his brother Martial H. Amilcar robbed a victim at gunpoint and then kicked him in the head. PSR ¶ 49. In Martial H. Amilcar's sentencing submission, he claims this 2015 armed robbery was in furtherance of the Hyena Crips. ECF Dkt. No. 218 at 5.

network nd politics . . . on crip." He sent a message to Richler Morette, his co-defendant, in June 2021, stating, "I'm hyena bro."

      C.    <u>The Defendant's Acts in Furtherance of the Enterprise</u>

As a member of the Hyena Crips, the defendant took an active role in gathering personally identifiable information ("PII") from non-consenting or unwitting victims and using that information to obtain fraudulent loans. PSR ¶ 10. The defendant then imparted information to his fellow gang members, to allow more members to successfully perpetrate financial scams. For instance, in a group chat, on April 18, 2021, the defendant explained together they could "talk a few money flex so gang cud eat as a whole." He also warned other members of the gang who were not actively participating, "don't be mad when n***** making money."

The same chats also show him discussing the fraudulent scheme described in paragraph 10 of the PSR and telling another gang member the amount of a loan for which he should apply from the Small Business Administration ("SBA") so as to avoid triggering suspicion from the government. In September 2021, he chided the other gang member who sought a $102,000 SBA loan, "went to [sic] high gotta go for 10K."

The defendant also discussed using PII from their victims to open up bank accounts in which to deposit their ill-gotten gains. When one of his co-defendants announced he successfully obtained a fraudulent SBA loan and requested a bank account in which to deposit the proceeds, in August 2021, the defendant ordered the other members to respond quickly, saying, "n***** by you better be on ya timing or I'm on n***** ass." That same month, a co-defendant contacted the defendant to find a Wells Fargo bank account "asap" to deposit fraudulent returns. The defendant replied that he had no fraudulent accounts at Wells Fargo, but that he had PII to open one up ("I got pros I cud try to open up.").

In addition to fueling money-making scams for the gang, the defendant also engaged in a conspiracy to kill the gang's rivals. The promotion of the gang's violent reputation was a central tenet of the Hyena Crips and the government's evidence shows various examples of members ordered to commit violence because of their membership in the gang and attacking rivals (or perceived rivals) in retaliation for certain actions. The defendant not only agreed to join his fellow gang members in these acts of violence but he organized others to carry them out.

For example, on the morning of February 22, 2019 — the day 15-year-old Samuel Joseph was shot and killed — the defendant was captured on security-camera footage hiding in a convenience store before attacking Samuel Joseph's brother ("Rival Gang Member 1") with a glass bottle. In the resulting altercation, Rival Gang Member 1 stabbed the defendant in the leg. Later that day, the defendant's brother Martial H. Amilcar then went to the home of Rival Gang Member 1 and killed Samuel Joseph in apparent retaliation for the stabbing.[3] Although the defendant did not participate in Samuel Joseph's execution, the defendant's actions in attacking rivals precipitated the events that led to the murder.

---

      [3]    As he notes in his submission and as reflected in the PSR, the defendant was arrested and charged for committing the murder of 15-year-old Samuel Joseph. The murder of Joseph was in fact committed by his brother and co-defendant, Martial H. Amilcar.

In another example, on August 8, 2021, the defendant sent a Telegram message to several fellow gang members indicating that he knew the location of a relative of Rival Gang Member 1 ("Rival Gang Member 2") and proposed the gang "finish him" and then "go party nd [sic] celebrate in the hood." The defendant wrote, "A opp gone be in queens tonight by himself with mad bitches. Let's deal with him. No more passes for these n*****." When a fellow gang member ("Co-Conspirator 1") asked the defendant who, the defendant explained, "Bro he a opp he [Rival Gang Member 1] family Nd some bitch I knoo sed she was going to a lounge with son." When Co-Conspirator 1 asked the defendant about going to the lounge where Rival Gang Member 2 was going to be, he and the defendant had the following exchange:

> The defendant: Yea n**** to finish him then we go party Nd celebrate in the hood. There's a party in the hood
>
> Co-Conspirator 1: Lol u want n***** to finish him then go party?
>
> The defendant: Yea n**** fucc

Another gang member ("Co-Conspirator 2") subsequently agreed to join the defendant in going to kill Rival Gang Member 2 at the night club. Later that night, while wearing a court-ordered ankle monitor, the defendant told the Telegram chat that he was "at the spot" and "boutta apply pressure." But when Co-Conspirator 2 did not come inside the night club, the defendant did not proceed with the planned murder and instead complained that Co-Conspirator 2 was a "pussy" and that the defendant had been "locced up came home put in more work then mad n*****s."

Three months prior, in the same gang chat, the defendant discussed getting a gun with the gang's leader, co-defendant Dave Augustin, who had just obtained two firearms from Pennsylvania. The defendant told Dave Augustin that "I like something to keep in my pocket," and that he believed the gang owed him a gun for having been arrested and cleared for the murder of Samuel Joseph. There is, therefore, every reason to believe that the defendant was capable of committing the murder that he attempted to carry out.

Moreover, it is notable, then, that even after the defendant's brother killed Samuel Joseph, the 15-year-old brother of Rival Gang Member 1—and even after the defendant himself had been arrested and detained for that murder—the defendant sought to kill <u>another</u> family member of Rival Gang Member 1 two years later.

4

II.    The Sentencing Guidelines

The government agrees with Probation's calculation of the Sentencing Guidelines[4] and submits that the defendant's offense level under the Guidelines is as follows:

R.A. 6: Conspiracy to Commit Identity Fraud (Small Business Administration)

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2B1.1(a)(1)) | 6 |
| Plus: Loss exceeds $95,000 (§ 2B1.1(b)(1)(E)) | +8 |
| Plus: Offense involved use or transfer of means of identification to obtain another means of identification (§ 2B1.1(b)(11)) | +2 |
| Plus: Offense involved unauthorized public dissemination of personal information (§ 2B1.1(b)(18)(B)) | +2 |
| Total: | **18** |

R.A. 10: Conspiracy to Murder Rival Gang Members and Associates

| | |
|---|---:|
| Base Offense Level (§§ 2E1.1(a)(2), 2A1.5)) | 33 |
| Total: | **33** |

Multiple Racketeering Act Analysis (§ 3D1.4)

| | |
|---|---:|
| Highest Adjusted Offense Level | 33 |
| Units: | |
| Racketeering Act 6 (§ 3D1.4(a)) | 0 |
| Racketeering Act 10 (§ 3D1.4(a)) | 1 |
| Total Units | 0 |

---

[4] The government's estimate of the Guidelines in the plea agreement included an additional one-point reduction for a global resolution, pursuant to U.S.S.G. 5K2.0, if seven defendants pled guilty by May 8, 2025. Because all listed defendants did not plead guilty by that date, the additional point should not be applied here. The government's estimate for Racketeering Act 6 also included an additional 2-point enhancement that the government no longer seeks to apply here. The government notes that application of that enhancement does not result in a change in the total adjusted offense level.

|  |  |  |
|---|---|---|
| | Levels Added (§ 3D1.4): | +0 |
| Less: | Acceptance of Responsibility (§ 3E1.1) | -3 |
| | Total: | <u>30</u> |

Because the defendant is in criminal history category I, the resulting advisory Guidelines range is 97 to 121 months' imprisonment. PSR ¶ 90. The defendant does not object to the Guidelines calculation but seeks a 2-point minor role adjustment pursuant to U.S.S.G. § 3B1.2. Def. Mot. at 2-8. No such reduction is appropriate.

In assessing a defendant's relative culpability in RICO cases, the Court's analysis focuses on "the defendant's role in the overall RICO enterprise." United States v. Ivezaj, 568 F.3d 88, 99 (2d Cir. 2009). The defendant bears the burden of showing by a preponderance of the evidence that he is entitled to any mitigating-role adjustment. United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001). The Guidelines application notes list several, non-exhaustive factors to consider in deciding whether a mitigating-role adjustment is warranted, including (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning and organizing criminal activity; (3) the degree to which the defendant exercised decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the crime; and (5) the degree to which the defendant stood to benefit from the criminal activity. U.S.S.G. § 3B1.2 App. Note 3(C). Each of these factors weighs against any kind of mitigating-role adjustment for the defendant.

As reflected above, the defendant was an extensive participant in the gang's activities. His role included coordinating activities on behalf of the gang, planning criminal activity for the purpose of benefitting the gang as a whole, and directing other gang member as to whether and how to commit crimes. Specifically, the defendant worked directly with the gang's leader, Dave Augustin, to coordinate the gang's SBA fraud; he arranged chats with gang members so that each member could keep others informed about their activities in furtherance of making money for the gang; and he told other members how to maximize the likelihood of success in committing fraud.

In other contexts, the defendant complained that other gang members were not "enforcing" sufficiently on behalf of Dave Augustin and bragged that he would do so instead once he had his ankle bracelet removed. He also bragged about how much "work" he put in for the gang. And most importantly, his involvement in the conspiracy to murder rival gang members shows that he had the authority within the gang to order retaliation and to direct other gang members to do so, as well. These facts all show that the defendant "had a proprietary interest" in the gang's criminal activity and had significant "understanding of the scope and structure of the enterprise and of the activities of others" such that any minor-role reduction would be inappropriate. U.S.S.G § 3B1.2 App. Notes 4 & 5. Indeed, the facts described above are more consistent with the defendant's being a leader or organizer of the enterprise than a minor participant.

III.   Applicable Law

The Sentencing Guidelines are advisory, not mandatory. <u>United States v. Booker</u>, 543 U.S. 220, 258-61 (2005). However, the Supreme Court held in <u>Booker</u> that the sentencing court must consider the Guidelines in formulating an appropriate sentence. <u>Id.</u> In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of <u>Booker</u>:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

<u>Gall</u>, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted). Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2).

IV.   A Sentence of 121 Months Is Warranted Here

The relevant Section 3553(a) factors—particularly the nature and circumstances of the offense, the history and characteristics of the defendant and the need for deterrence, both specific and general—weigh heavily in favor of a sentence at the high end of the Guidelines range. The defendant's arguments for a 55-month sentence—a sentence that is half of the applicable Guidelines range—are unpersuasive and should be rejected.

The defendant's conduct is incredibly serious. For years, the defendant was an active member of a violent street gang that targeted a largely immigrant community in the Flatbush neighborhood of Brooklyn. The defendant personally participated and helped oversee fraudulent schemes that enriched the gang's leadership and funded the gang's criminal operations, which included their purchase and sale of firearms and narcotics. More importantly, he organized a conspiracy to kill someone perceived to be a member or associate of a rival gang—even going so far as to identify a specific location at which to kill that individual and going to that location himself—while wearing a court-ordered ankle monitor. The only reason the defendant, who appears to have procured a firearm months earlier, did not go through with his plan to commit the murder was because a co-conspirator failed to arrive on time.

In his submission, the defendant seeks leniency on account of relative youth at the time he committed the charged crimes. Def. Mot. 13-14 (citing to U.S.S.G. § 5H1.1).[5] But as reflected above, the defendant's crimes were the product of "repeated and calculated decision to engage in criminal activity" that weighs heavily against viewing his relative youth and upbringing as mitigating factors warranting leniency. United States v. Ramirez, 571 F. Supp. 3d 40, 49 (S.D.N.Y. 2021); see United States v. Glynn, No. 06-CR-580 (JSR), 2022 U.S. Dist. LEXIS 32794, at *13-14 (S.D.N.Y. 2022) ("the attributes of [the defendant's] upbringing and relative youth do not explain away the reality that he committed a calculated murder for personal gain"). Moreover, his sentencing submission and supplement shows that the defendant committed the instant offense despite the love and support of his family. In fact, by his actions, the defendant demonstrated his commitment not to his own family but to the Hyena Crips. Significant, punitive consequences are warranted here.

The defendant's sustained and enthusiastic participation in the Hyena Crips' criminal activities demonstrates the need for both specific and general deterrence. As described above, roughly two years before the defendant engaged in the predicates to which he pled guilty, the defendant initiated a violent altercation that ultimately resulted in his brother shooting and killing the 15-year-old brother of Rival Gang Member 1. The defendant was misidentified as the shooter and was in custody for over nine months on that charge. The fact that the defendant then engaged in the charged conduct—including a conspiracy to murder another family member of Rival Gang Member 1—<u>after</u> he had both seen the consequences to innocent victims from his violent participation in the gang and had been jailed in connection with the gang's violent crimes is telling. It demonstrates that the defendant is likely to remain a significant threat to the community if he is not incapacitated for a meaningful period of time. Moreover, any sentence below the high end of the Guidelines would not sufficiently deter other gang members from the types of violent and dangerous behavior the defendant engaged in repeatedly in this case.

The defendant argues that his wrongful incarceration by New York State for over nine months in connection with the Samuel Joseph murder warrants leniency here. Def. Mot. 9-13. It does not. Although the government acknowledges the toll on the defendant as a result of his arrest and incarceration for a crime he did not commit, the prior term of wrongful imprisonment cannot be a blank check to commit new crimes and rely upon prior incarceration as a means to avoid future incarceration.[6] Stunningly, after his release for that arrest, the defendant re-dedicated himself to the Hyena Crips, orchestrating identity theft and the theft of government funds, and pledging to kill their rivals.

---

[5] After the PSR was issued, the Sentencing Guidelines were amended to remove § 5H1.1 and most "departures and policy statements relating to specific personal characteristics." See USSG App. C, amendment 836. The Sentencing Commission explained, however, that the Court can continue to consider relevant factors pursuant to 18 U.S.C. § 3553(a). See U.S. Sentencing Commission, Amendments to the Sentencing Guidelines at 82 (April 30, 2025), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202505_RF.pdf.

[6] The defendant received a substantial monetary settlement for his state arrest in connection with the Samuel Joseph murder. See Amilcar v. Pignatelli, 22-CV-1000 (CBA), ECF Doc No. 32-1.

Finally, as noted in the PSR, the government has not argued that the Samuel Joseph murder is relevant conduct for purposes of calculating the defendant's Guidelines. PSR ¶ 2. To the extent the Guidelines contemplate sentencing reductions or adjustments for prior terms of custody, it generally limits those adjustments to situations in which the prior time spent custody was for relevant conduct. See U.S.S.G. § 5G1.3(b)-(c) (directing courts to adjust sentences to avoid situations in which the defendant is punished twice for "relevant conduct"). While the defendant's prior arrest and incarceration is regrettable, it is not a basis for leniency here.

In a similar vein, the defendant argues that the poor conditions at the Metropolitan Detention Center in Brooklyn ("MDC") are such that the Court should give him additional credit for time already served in pre-trial detention. Def. Mot. at 19-20. While the government takes seriously the legitimate concerns raised about conditions at the MDC in recent years, it is also true that courts have more recently rejected similar claims to that made by the defendant on the grounds that conditions have improved. See United States v. Reshard, No. 24 Cr. 392 (JMF) (S.D.N.Y. May 14, 2025) ("staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction"); United States v. Burgos, No. 24 Cr. 650 (LTS), Plea Tr. at 43:25 (S.D.N.Y. May 21, 2025) ( "the conditions at the MDC detention facility have improved, including because staffing there has been increased"). Conditions at the MDC ought not to be a basis for additional leniency here either.

V.   Conclusion

For the foregoing reasons, the government respectfully submits that a sentence of 121 months is sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:            /s/
Devon Lash
Jessica K. Weigel
Joshua B. Dugan
Assistant U.S. Attorney
(718) 254-7000

cc:   Clerk of the Court (AMD) (by ECF)
      Defense Counsel of Record (by ECF)